**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 8 1998**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

FRANCES SHERMAN,

       Plaintiff-Appellant,

v.

KENNETH S. APFEL, Commissioner,
Social Security Administration,[*]

       Defendant-Appellee.

No. 97-7085
(D.C. No. 96-CV-217)
(E.D. Okla.)

---

**ORDER AND JUDGMENT**[**]

---

Before **ANDERSON**, **McKAY**, and **LUCERO**, Circuit Judges.

---

Plaintiff appeals from a district court order affirming the Commissioner's

decision to deny her applications for disability insurance benefits and

supplemental security income.[1]  In what became the final decision of the

---

[*]    Pursuant to Fed. R. App. P. 43(c), Kenneth S. Apfel is substituted for John J. Callahan, former Acting Commissioner of Social Security, as the defendant in this action.

[**]    This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[1]    After examining the briefs and appellate record, this panel has determined

(continued...)

Commissioner, the administrative law judge (ALJ) found that plaintiff's chronic hepatitis C, depression, and substance addiction constituted severe impairments. The ALJ further found, however, that plaintiff's impairments only restricted her to light work involving simple tasks. Therefore, the ALJ concluded that plaintiff retained the residual functional capacity (RFC) to perform four of her past jobs, which involved light or sedentary, unskilled work.

We review the Commissioner's decision to determine whether it "is supported by substantial evidence and adheres to applicable legal standards." Berna v. Chater, 101 F.3d 631, 632 (10th Cir. 1996). "Because [s]ubstantiality of evidence must be based upon the record taken as a whole, we must meticulously examine the record to determine whether the evidence in support of the [Commissioner's] decision is substantial and take into account whatever in the record fairly detracts from its weight." Washington v. Shalala, 37 F.3d 1437, 1439 (10th Cir. 1994) (quotations and citations omitted). We reverse and remand for further proceedings in light of cumulative errors undermining the ALJ's analysis of plaintiff's impairments.

---

[1](...continued)
unanimously to grant the parties' request for a decision on the briefs without oral argument. See Fed. R. App. P. 34(f); 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.

I. The Evidence

In June 1991, plaintiff began seeking treatment from Dr. Pena, a family practitioner, for headaches, fatigue, and depression. In September 1992, blood tests established that plaintiff, an admitted intravenous drug user, had hepatitis. She later started having abdominal pain and diarrhea, for which she also sought treatment, and ultimately stopped working in December 1992. Plaintiff said that she had been falling asleep at work for days before she left.

In January 1993, plaintiff was still complaining of fatigue and Dr. Pena referred her to Dr. Burdick, a gastroenterologist, who had a long discussion with her about the potential for treatment with Interferon.[2] Dr. Burdick reported that plaintiff's chronic fatigue was probably secondary to her hepatitis, noting that "fatigue does not differentiate between patients with mild or severe liver disease." Appellant's App., Vol. II, at 197.

After plaintiff's longtime boyfriend died of hepatitis in March 1993, she became even more depressed. Plaintiff moved to California, where she slipped back into using drugs. She continued to suffer occasional bouts of diarrhea, frequent headaches, fatigue, and peripheral swelling, and sought treatment from

---

[2]     Interferon is an antiviral agent used in the treatment of certain kinds of hepatitis. It is "given by . . . injection, is expensive, and produces bothersome flu-like side effects in almost all patients." The Merck Manual of Diagnosis & Therapy 906 (Robert Berkow & Andrew J. Fletcher eds., 16th ed. 1992).

Dr. Allen, an internist. Dr. Allen referred plaintiff to Dr. Olson, a gastroenterologist, who performed a liver biopsy. The biopsy established that plaintiff had chronic active hepatitis C,[3] and Dr. Olson recommended treatment with Interferon. Because depression can be a side effect of Interferon, Dr. Olson advised that the treatment be delayed three months, to see if plaintiff's depression resolved. In August 1993, Dr. Allen wrote a letter to the Social Security Administration discussing Dr. Olson's intention of beginning Interferon treatment once plaintiff's depression resolved. Dr. Allen stated that he believed plaintiff was presently disabled, but that her future course might improve--presumably with Interferon treatment--to the point that she would no longer be disabled.

In July 1993, plaintiff saw Dr. Kerwin for a second opinion. Plaintiff complained of fatigue, forgetfulness, blackouts, and swelling. Dr. Kerwin noted that most of plaintiff's symptoms were related to her hepatitis and depression. Plaintiff saw Dr. Kerwin numerous times over the next eight months, complaining of fatigue and depression, for which she was prescribed antidepressants and

---

[3] Chronic active hepatitis, sometimes called chronic aggressive hepatitis is a "*serious* disorder [which] often results in liver failure and/or cirrhosis. . . . Nonspecific malaise, anorexia, and fatigue often dominate the clinical picture, sometimes with low-grade fever and nondescript upper abdominal discomfort. Jaundice is variable and is not always present." The Merck Manual of Diagnosis & Therapy, at 905. "Prognosis is highly variable. . . . Cases associated with [hepatitis B virus] or [hepatitis C virus] tend to progress and . . . are usually resistant to therapy." Id. at 906.

antianxiety medication. In November 1993, Dr. Kerwin filled out a form for plaintiff's lender on which he stated that plaintiff had been temporarily totally disabled since December 1992, and that her anticipated recovery date was "indefinite." Id. at 281.

At the beginning of May 1994, plaintiff moved to Oklahoma so that she could be treated at the Choctaw Nation Hospital. Plaintiff was first seen there on May 3 and was still being treated there at the time of the hearing before the ALJ in December 1994. Liver tests performed in May and June 1994 showed an upward trend in certain liver enzymes, and hospital records showed continued complaints of headaches, diarrhea, abdominal pain, decreased energy, depression and anxiety. Plaintiff was prescribed antidepressants and antianxiety medications, but was advised to avoid Tylenol and other medications that are detoxified by the liver. At her request, plaintiff also was referred to Dr. Golla, a gastroenterologist. Although plaintiff testified at the administrative hearing that Dr. Golla was treating her, the record does not contain any of his treatment notes or other medical records.

On December 14, 1994, Dr. Deese, plaintiff's treating physician at the Choctaw Nation Hospital, opined that plaintiff's hepatitis resulted in a "[s]evere limitation of functional capacity," making her "incapable" of sedentary activity. Id. at 285. Dr. Deese also opined that plaintiff's depression resulted in a

"[m]oderate limitation" of functional capacity, making her "able to engage in only limited stress situations and engage in only limited interpersonal relations." Id. He further stated that plaintiff was "depressed from her chronic disease which has not been treated and is mentally debilitating." Id. at 286.

At the administrative hearing in December 1994, plaintiff said that her primary concern since December 1992 had been to get treatment before her liver became so bad that it could not be treated. She said she had not yet been able to receive Interferon treatment because she could not afford it. She explained that she could not qualify for Medicaid without a finding of disability, and the Choctaw Nation Hospital told her it did not have the funds to pay for the treatment. Plaintiff said that her only source of income were the welfare payments she received for her teenage daughter who lived with her.

Plaintiff testified to very limited daily activities. She felt that her chronic fatigue was the most limiting of her symptoms. Plaintiff also testified that she suffered almost daily headaches, which could last as long as four or five hours. She said she did not take Tylenol or pain relievers because of her liver and was able to obtain relief only by lying down, sometimes with ice packs on her head. Plaintiff said she continued to be depressed and was easily upset. Plaintiff also described difficulties with bouts of diarrhea, stomach pains, and nausea. She felt that her condition had gotten worse since December 1992.

At the conclusion of plaintiff's testimony, a vocational expert (VE) was called to testify. In response to the ALJ's question, the VE testified that if plaintiff's only limitations were that she could lift no more than twenty pounds and frequently lift or carry no more than ten pounds, then she would be able to perform all of the jobs comprising her past relevant work, except those that were performed at the medium exertional level. If he took into account all the limitations to which plaintiff testified, however, then the VE did not think that plaintiff would be employable. The VE explained that plaintiff's daily headaches, which she said were relieved only by lying down, would eliminate even sedentary work. He also identified her fatigue and depression as problematic, saying: "I really feel that the cumulative effects of all these things, her lack of energy as she's demonstrated today even in her manner today, I feel that she just wouldn't have enough energy to sit eight hours a day and do sedentary work." Id. at 104.

In February 1995, the Commissioner arranged for plaintiff to be examined by Dr. Inbody, a psychiatrist, who was also given what he described as "a rather extensive medical record" to review. Id. at 288. Dr. Inbody diagnosed plaintiff with moderate depression and ongoing polysubstance abuse. He reported that plaintiff had severe psychosocial stressors and gave her a "global assessment of functioning" (GAF) score of forty-five, id. at 290, which meant that she had "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent

shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)," American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 32 (4th ed. 1994).

Dr. Inbody's report consisted of a narrative portion and an attached mental RFC form, provided by the Commissioner. On the latter, Dr. Inbody reported that plaintiff had limited but satisfactory abilities to: (1) follow work rules; (2) understand, remember and carry out simple, detailed, and complex job instructions; and (3) maintain her personal appearance. He also reported that plaintiff was seriously limited in her abilities to: (1) relate to co-workers; (2) deal with the public; (3) use judgment with the public; (4) interact with supervisors; (5) deal with work stresses; (6) function independently; (7) maintain attention and concentration; (8) behave in an emotionally stable manner; (9) relate predictably in social situations; and (10) demonstrate reliability. <u>See</u> Appellant's App. Vol. II, at 291-92.

## II. Recent Statutory Amendments

Before considering plaintiff's challenges to the ALJ's decision, we must first address the Commissioner's argument on appeal that we should affirm the denial of benefits based on recent changes to the Social Security Act. On

March 29, 1996, Congress amended provisions of both Title II (disability insurance benefits) and Title XVI (supplemental security income) to provide that "[a]n individual shall not be considered to be disabled for purposes of this title if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." Contract With America Advancement Act of 1996, Pub. L. 104-121, § 105(a)(1), (b)(1), 110 Stat. 847, 852, 853 (codified as amended at 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J) (1997)). The Commissioner contends that these amendments apply to all Title II and Title XVI cases still pending before either the agency or the courts on March 26, 1996, including this one.

We need not decide whether these amendments apply to the present case because they do not affect our review at this stage of the proceedings. The implementing regulations make clear that a finding of disability by the Commissioner is a condition precedent to an application of the amendatory language: "If [the Commissioner] find[s] you are disabled and ha[s] medical evidence of your drug addiction or alcoholism, [the Commissioner] must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability." 20 C.F.R. §§ 404.1535(a), 416.935(a). To make this determination, the Commissioner must decide whether the claimant would still be found disabled if the claimant stopped using drugs.

-9-

See id. §§ 404.1535(b)(1), 416.935(b)(1). If so, then the drug addiction is *not* a contributing factor material to the finding of disability. See id. §§ 404.1535(b)(2)(ii), 416.935(b)(2)(ii). If, however, the claimant's remaining impairments would not be disabling without the drug addiction, then the drug addiction *is* a contributing factor material to the finding of disability. See id. §§ 404.1535(b)(2)(I), 416.935(b)(2)(I).

For us to attempt to apply the amendments, when the Commissioner has made no finding of disability, would be to put the proverbial cart before the horse. Contrary to the Commissioner's suggestion, we may not substitute our judgment for his by deciding whether plaintiff's drug use constitutes an addiction that would be a contributing factor material to a finding of disability were the Commissioner to make such a finding. Whether plaintiff is disabled and what role her drug use plays in any disability are questions for the Commissioner to address on remand. For now, we consider only whether the Commissioner correctly determined that plaintiff was not disabled, based on the record as a whole.

### III. Plaintiff's Challenges to The ALJ's Decision

The ALJ found that plaintiff's hepatitis, depression, and substance abuse constituted severe impairments that restricted her to light or sedentary jobs

requiring only the ability to understand, remember, and carry out simple instructions. In reaching this conclusion, the ALJ rejected most of plaintiff's allegations about her nonexertional limitations, and also rejected the opinions of plaintiff's treating and examining physicians about her ability to work.

Plaintiff challenges the ALJ's decision on three grounds: (1) the ALJ did not properly consider medical source opinions; (2) the ALJ did not properly evaluate the credibility of her subjective complaints; and (3) the ALJ's determination that she retained the residual functional capacity to perform sustained light and sedentary work was not supported by substantial evidence. Plaintiff's arguments highlight several interrelated errors that undermine the ALJ's entire decision.

The first error was the ALJ's mischaracterization of the level of plaintiff's daily activities. This error relates to plaintiff's first and second challenges to the ALJ' decision. In the spring of 1993, plaintiff filled out three forms containing questions about her daily activities and the effect of her impairments on those activities. Her mother, Mrs. Camp, also completed a form asking similar questions in September 1993. According to the ALJ, these forms showed that, despite her impairments, plaintiff still got up in the morning, took a shower and did dishes or laundry. Further, plaintiff was able to do her own household chores,

-11-

such as preparing meals and grocery shopping, as well as maintain her hobbies, watch television, read a significant amount, and drive.

In so describing plaintiff's activities, the ALJ ignored other statements on the same forms that evidenced limitations on plaintiff's activities. For instance, in concluding that plaintiff did a significant amount of reading, the ALJ apparently focused on Mrs. Camp's recitation of the wide variety of materials plaintiff read, while ignoring plaintiff's statement that she fell asleep whenever she watched television or read.

Likewise, the ALJ mentioned only that plaintiff performed some household chores, while ignoring her statements that household chores were the most difficult activity and that she had to stop and start because she tired easily while doing them. Also, Mrs. Camp said she did not think plaintiff would do well completing household chores if she were under time demands. She reported that plaintiff tended to get side-tracked because she would start a task, then have to stop due to fatigue or pain, and would forget to complete the task before turning to another one. Until she moved in with her parents for a brief period in mid-1993, plaintiff reported that she sometimes waited several days to do her dishes. Even after plaintiff left her parents' home and moved in with her cousin, Mrs. Camp reported that she continued to do plaintiff's laundry for her.

Additionally, while the ALJ was correct in noting that plaintiff said she usually got up, showered, and did "what really stands out to be done," he overlooked the remainder of her statement that she would then lie down on the couch. Id. at 170. Similarly, while plaintiff did list "decorating & dressing teddy bears in peacock chairs" and silk flower arrangements as hobbies, she reported that she could not work for a long time on a project. Id. at 172. The ALJ also failed to mention that plaintiff's meal preparation consisted primarily of microwave dinners, sandwiches, and cold cereal, and that even grocery shopping was tiring for plaintiff.

By mentioning only parts of plaintiff's and her mother's statements, while leaving out other important parts, the ALJ engaged in the kind of selective and misleading evidentiary review that this and other courts have rejected. See, e.g., Sisco v. United States Dep't of Health & Human Servs., 10 F.3d 739, 743 (10th Cir. 1993); Teter v. Heckler, 775 F.2d 1104, 1106 (10th Cir. 1985); Binion ex rel. Binion v. Chater, 108 F.3d 780, 788 (7th Cir. 1997); Fiorello v. Heckler, 725 F.2d 174, 175-76 (2d Cir. 1983). The ALJ then used his mischaracterization of the level of plaintiff's daily activities to discount her subjective allegations of disabling nonexertional limitations and to discredit the RFC assessment of Dr. Deese, plaintiff's treating physician at the Choctaw Nation Hospital. The ALJ also used plaintiff's statements from 1993 to discredit her testimony about the

level of her activities in December 1994, without considering her testimony that her condition had worsened over time.

In evaluating whether plaintiff's nonexertional limitations were disabling, the ALJ said he followed the familiar framework set forth in Luna v. Bowen, 834 F.2d 161, 163-165 (10th Cir. 1987). The Luna analysis proceeds as follows: (1) if the objective medical evidence establishes that the claimant has a physical or mental impairment capable of producing the nonexertional limitation at issue; and (2) accepting all the claimant's allegations as true, there is a loose nexus between the impairment and the nonexertional limitation alleged; then (3) the ALJ must consider all of the evidence--objective and subjective--to determine whether the nonexertional limitation is disabling. Id. at 163.

The ALJ apparently concluded that there was a loose nexus between plaintiff's subjective symptoms and her mental and physical impairments, and the record bears this out. Nonetheless, the ALJ discounted the severity of plaintiff's complaints at the third step of the Luna analysis for the following reasons: (1) "the documentary medical evidence shows the claimant's hepatitis is not of such severity as to be productive of severe, disabling symptomatology," id. at 39-40; (2) although plaintiff complained of diarrhea, vomiting, and abdominal pain, she showed "no significant weight loss," id. at 40; and (3) although plaintiff's hearing testimony "show[ed] restricted daily activities," prior statements by

plaintiff and her mother showed less restricted activities, id.  The ALJ also stated that plaintiff's "level of functioning appears to be affected primarily by her depression and renewed use of drugs," but then went on to say that "[r]ecords show the claimant's use of drugs is voluntary, and that her depression is 'situational.'"  Id.

Turning to the first reason articulated by the ALJ, we note that an ALJ may consider the lack of an objective medical basis to support the degree of limitation alleged as a factor in evaluating a claimant's credibility, but the ALJ may not use the lack of corroborating objective medical evidence to disregard the claimant's allegations.  See Luna, 834 F.2d at 165.  In any event, the medical evidence concerning the effect of plaintiff's hepatitis on her ability to work generally contradicts the ALJ's conclusion.  Dr. Burdick, the first gastroenterologist to whom plaintiff was referred, stated that "fatigue does not differentiate between patients with mild or severe liver disease."  Id. at 197.  Further, those of plaintiff's physicians who expressed an opinion consistently concluded that plaintiff's hepatitis severely impacted her ability to work.  Thus, the medical evidence concerning the severity of plaintiff's hepatitis does not provide a basis for rejecting plaintiff's complaints of chronic fatigue and other hepatitis-related symptoms.

-15-

Although the second reason articulated by the ALJ may provide a basis for discounting the severity of plaintiff's abdominal pain, diarrhea, and nausea, it does not undermine her complaints of other nonexertional limitations, such as frequent headaches or fatigue, which plaintiff described as her most limiting symptom. The ALJ's third reason for discounting plaintiff's subjective complaints is based on his mischaracterization of her level of daily activities, which we previously discuss and reject.

The ALJ's conclusion that plaintiff's renewed drug use is one of the primary factors affecting her ability to function is not supported by the record. In fact, except for plaintiff's hearing testimony, the record is essentially devoid of evidence about the effects of plaintiff's drug use. The only evidence directly addressing the effects of plaintiff's drug use is her testimony that she started using heroin again when she moved to California because it helped her escape her feelings and made it easier to cope with her physical symptoms, that smoking marijuana made her headaches better, and that using crank, which she had done five or six times since moving to Oklahoma, ultimately made her feel worse. This testimony does not provide substantial evidence in support of the ALJ's conclusion about the effects of plaintiff's drug use on her ability to function.

Nor is there record support for the ALJ's suggestion that the effects of plaintiff's depression could be discounted because her depression was merely

"situational." Dr. Olson, the gastroenterologist who treated plaintiff shortly after her boyfriend died, did state in his notes that plaintiff's "problems with depression . . . apparently are situational," id. at 247, and he hoped her depression would resolve sufficiently in three months' time to begin Interferon treatment, id. at 243. The medical record, however, is filled with treatment notes dating back as far as September 1992 that mention plaintiff's depression and reflect treatment with antidepressants. Moreover, Dr. Inbody's diagnosis of moderate depression as late as February 1995 belies Dr. Olson's suggestion in June 1993 that plaintiff's depression was merely "situational."

The ALJ also erred by selectively crediting and rejecting portions of Dr. Inbody's report. The ALJ essentially credited all Dr. Inbody's findings and conclusions in the narrative portion of the report about plaintiff's mental status, but then rejected all his conclusions on the attached form about how plaintiff's mental status affected her ability to work. The ALJ explained that he did not find plaintiff's hearing testimony credible and, therefore, "[i]n view of Dr. Inbody's reliance on the claimant's complaints, the Administrative Law Judge gives little evidentiary weight to the medical opinion of Dr. Inbody." Id. at 38-39. The ALJ also stated that Dr. Inbody's opinions were inconsistent with his objective findings.

-17-

A physician's medical opinion includes not only his clinical findings and test interpretations, but also his subjective judgments. Cf. Lester v. Chater, 81 F.3d 821, 832 (9th Cir. 1995). Generally, an ALJ may not rely on some portions of a physician's medical report, while disregarding others. See Switzer v. Heckler, 742 F.2d 382, 385-86 (7th Cir. 1984) ("[T]he Secretary's attempt to use only the portions [of a doctor's report] favorable to her position, while ignoring other parts, is improper."). Moreover, the reasons the ALJ recited for rejecting a portion of Dr. Inbody's opinion cannot withstand scrutiny. First, contrary to the ALJ's assumption, it is not clear that the opinions Dr. Inbody expressed about plaintiff's ability to work were based on her subjective complaints, rather than on Dr. Inbody's own medical judgment based on his examination. In any event, as we discuss above, the ALJ's analysis of plaintiff's subjective complaints was severely flawed and, therefore, cannot provide a proper basis for discrediting Dr. Inbody's opinions. Further, while a conflict between Dr. Inbody's findings and his conclusions might justify rejecting the latter, the ALJ did not explain how Dr. Inbody's conclusions were inconsistent with his findings. The only conflict that we see is between Dr. Inbody's statement in the narrative portion of his report that plaintiff "showed no disturbances in attention and concentration," Appellant's App., Vol. II, at 289, and his indication on the attached form concerning work-related abilities that plaintiff's ability to "[m]aintain

-18-

attention/concentration" was "seriously limited, but not precluded," id. at 291. Otherwise, Dr. Inbody's statements in the narrative portion of his report do not appear to conflict with his opinions on the form about plaintiff's ability to work.

The ALJ also erred in rejecting the RFC assessment of Dr. Deese on the grounds that it was not supported by either Dr. Inbody's mental status findings, the clinical findings, or the level of plaintiff's daily activities. Again, the ALJ did not explain what conflict existed between Dr. Inbody's mental status findings and Dr. Deese's conclusions, and we see no conflict between the two. Dr. Deese's conclusion that plaintiff's depression imposed moderate limitations on her ability to work, enabling her "to engage in only limited stress situations and [to] engage in only limited interpersonal relations," id. at 285, was entirely consistent with Dr. Inbody's conclusions about plaintiff's abilities to handle stress and to relate to other people.

The second reason the ALJ gave for rejecting Dr. Deese's opinion appears to relate to his assessment of how plaintiff's hepatitis, rather than her depression, affected her ability to work. The ALJ simply stated that the clinical findings did not support Dr. Deese's opinion, without providing any further explanation. Our review of the record shows that the medical evidence consistently established the existence of plaintiff's chronic fatigue, as well as other symptoms related to her hepatitis. We see no objective medical evidence suggesting that the severity of

plaintiff's hepatitis was not sufficient to produce symptoms as severe as those of which plaintiff consistently complained.

We turn, then, to the final reason the ALJ gave for rejecting Dr. Deese's opinion: that it was not supported by the level of plaintiff's daily activities. The ALJ's distorted assessment of plaintiff's daily activities was not supported by the record, however, so it could not provide a proper basis for discounting Dr. Deese's opinion.

Having discussed the ALJ's errors in considering medical source opinions and assessing plaintiff's subjective allegations of nonexertional limitations, we turn to plaintiff's final challenge to the ALJ's decision. Plaintiff contends that the evidence does not support the ALJ's conclusion that she retains the RFC for sustained work at the light or sedentary exertional levels. "In order to engage in gainful activity, a person must be capable of performing on a reasonably regular basis." Byron v. Heckler, 742 F.2d 1232, 1235 (10th Cir. 1984); see also Washington, 37 F.3d at 1442.

The record is replete with evidence that plaintiff suffers from chronic fatigue. Plaintiff stated that before she stopped working, she had been falling asleep at work and that her boss had caught her asleep at a machine. Plaintiff also said that she had to stop and start household chores and that she would have to go out to the car and lie down after shopping for thirty minutes. She testified

that it took her three months to complete twenty-seven days of community service she was ordered to perform in early 1994, because she was never physically able to work past noon. Even the VE commented that he did not think plaintiff would have the stamina to do even sedentary work for eight hours a day, based upon his observation of her at the hearing. Despite this evidence, the ALJ's assessment of plaintiff's RFC does not take into account the effects of her chronic fatigue. The ALJ either ignored or discredited, without a valid explanation, the evidence supporting plaintiff's contention that she cannot work on a sustained basis.

## IV. Conclusion

In light of the numerous errors made by the ALJ, we cannot say that the Commissioner's decision denying social security benefits is supported by substantial evidence or adheres to applicable legal standards. Therefore, we must reverse the denial of benefits and remand for further proceedings. If, on remand, the Commissioner finds plaintiff disabled, then he must consider whether she has a drug addiction that is a contributing factor material to the determination of disability and otherwise comply with the 1996 congressional amendments to Titles II and XVI.

The judgment is REVERSED, and the case is REMANDED to the district court with directions to remand to the Commissioner for further proceedings.

ENTERED FOR THE COURT

Carlos F. Lucero
Circuit Judge